**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:19-CR-00218-MOC-DSC**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| **EMMANUEL LEE BLOUNT,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress (Doc. No. 17), by which he seeks judicial suppression of all evidence obtained during a brief investigatory stop and vehicle protective search. Defendant contends the stop and search were unreasonable, and thus in violation of his Fourth Amendment rights. After briefing and argument, the motion is ripe for review. For reasons that follow, Defendant's motion is denied.

**I.    BACKGROUND**

The pertinent facts for this motion are straightforward, occurring over a few minutes. On December 24, 2018, at about 3:00 p.m., Officer Jonathan Szynarowski of the Charlotte Police Department was stationed in a marked police car in a Target parking lot near the store entrance. While there, he was approached by a store employee, who knocked on the car window and reported a "loud disturbance [and] possible fight going on in the parking lot." The officer exited the vehicle, then "heard a female screaming very loudly." While he could not "make out any words in particular," he gathered "it was a very distressed scream" and "sounded like she was in trouble." After hearing the scream, the officer requested backup and began to run toward its source.

Officer Szynarowski traced the sound to the middle of the parking lot, where he discovered two individuals sitting in a car and arguing: Keywonna McVay, a female, seated in the driver seat;

and Defendant, a male, seated in the front passenger seat with a small, crying boy in his lap.  The officer approached the vehicle and the two immediately began shouting over each other and to the officer that they were "good."  McVay volunteered that they "had just had an argument," and Defendant interjected that his son had "bumped his head."  The officer inquired as to why they were arguing, but they then denied arguing.  Defendant added that he was simply telling McVay to hand him the boy, who had hit his head.  See Body Camera Footage, at 0:45–1:02.

Based on his observations, the officer again radioed for backup.  Id. at 1:10–1:12.  In a subsequent hearing, he explained that, at that point, he thought it "more likely than not" that some domestic crime was occurring, such as: domestic assault, violating N.C. Gen. Stat. § 14-33; communicating threats, violating N.C. Gen. Stat. § 14-277.1; or injuring the personal property of another, violating N.C. Gen. Stat. § 14-160.  He provided several foundations for this belief.  First, the couple's insistence that the child had simply fallen was "inconsistent[]" with McVay's initial assertion that they had just had an argument.  Second, the distress in McVay's scream was not commensurate with "just a child falling inside the vehicle or outside"; instead, it was a "very, very loud scream" that "sounded like she was in trouble."  Third, the officer noticed that the incident involved a "male and a female" in particular.  Finally, the officer's inference was based on his training and experience; prior to this incident, he had responded to "numerous domestic violence calls every day, four days a week, fifty weeks a year."

According to Officer Szynarowski, where events give rise to domestic crimes concerns, it is "standard procedure . . . to separate both parties . . . so you can investigate, so they're not so hot headed . . . and to get each side of the story without coercion or influence from the other."  Thus, he asked Defendant to "hop out of the car" and leave the child so they could talk.  Id. at 1:18–1:21.  Rather than immediately exiting, Defendant turned his body towards the officer and kept his left

hand behind his back, such that the officer's view was obstructed. Even so, the officer quickly glimpsed three scenes over the next few seconds. First, Defendant appeared to "hand[] items over to Ms. McVay." Second, the officer saw a "black grocery-like . . . plastic bag." Third, Defendant "appear[ed] to tuck something underneath the passenger seat." After a few seconds, Defendant exited the car, but continued to hold the child. Again, the officer told him to put the child down. McVay then asked Officer Szynarowski "can we just go?" The officer responded "No."

During the hearing, Officer Szynarowski testified that, at this point, he was "nervous," "very uneasy" and "feared for [his] safety" for several reasons. First, he was "still alone by [him]self [and] outnumbered." Second, he already suspected this was a "domestic violence situation, which in and of itself is one of the more dangerous situations." Third, Defendant was "ignoring at least two commands,"[1] was "reaching around" where the officer could not "see his left hand for the majority of the time," and was "tucking stuff." Finally, from the movements, the officer "believe[d] that there may be a weapon in the car" and that some type of "weapons crime" was occurring, such as unlawfully carrying a concealed weapon, in violation of N.C. Gen. Stat. § 14-269. Based on these facts, he decided to "detain[] [Defendant] in handcuffs . . . to have more control over the situation." Officer Szynarowski directed Defendant to put his hands behind his back. Defendant protested that he "didn't have anything," but after the officer indicated he was not going to argue, Defendant complied without physical resistance. The officer asked Defendant whether he had "any weapons on [him]," to which he responded, "no, sir." Id. at 1:38–2:01.

---

[1] At the hearing, the officer testified Defendant "ignored at least two commands to get out of the car." Reviewing the body camera footage, the Court only heard the officer request that Defendant exit the car once. Even so, Defendant did ignore at least two commands: the command to get out of the vehicle, and the command to leave the child in the car.

3

While detaining Defendant, Officer Szynarowski observed that McVay "continued to be very active inside the vehicle, moving items around," including a large sum of cash. He thus commanded McVay to leave her hands on the steering wheel. After frisking Defendant to ensure he did not have a weapon and after commanding him to stand near the front of the vehicle, the officer approached the driver side of the car, asked McVay to step out, and handcuffed her as well. Id. at 2:01–2:50. The officer then asked what was placed in the bag. Both denied that anything was placed within a bag and continued to protest their detention. Id. at 3:00–3:10.

At this point, the officer could see that backup was "close but they weren't actually on scene yet." Once "backup was getting ready to pull in," he searched the vehicle, finding "a firearm underneath the passenger seat where [Defendant] was sitting." Backup arrived, so Officer Szynarowski instructed an assisting officer to place Defendant in the backup patrol car and to identify him. Officer Szynarowski also put in a request to identify the firearm. While waiting, he continued to search the vehicle, finding crack cocaine in the passenger side door.

Later, the officer was asked why he searched the car when both individuals were detained. He explained that, although they were handcuffed, "that doesn't eliminate [the] possibility that [something] would happen while [he was] still outnumbered." Moreover, if there was insufficient evidence of domestic violence, he "would have to uncuff them and release them back to the vehicle," and potentially back to a weapon.

Officers subsequently determined that Defendant was a felon. Id. at 14:00-14:15. He was thus indicted by a grand jury in the United States District Court for the Western District of North Carolina with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1, 11). Thereafter, Defendant moved to suppress the firearm and all other fruits from the allegedly unlawful investigatory stop and vehicle protective search. (Doc. No. 17).

4

## II. DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Here, it is undisputed that Defendant was seized from the moment that he and McVay were told "they were not free to leave when they asked to do so." (Doc. No. 17 at 5 (citing United States v. Jones, 678 F.3d 293, 299 (4th Cir. 2012)); see Doc. No. 20 at 5). Even so, the litigants disagree whether the investigatory stop and the vehicle protective search were reasonable under the circumstances. The Government bears the burden of justifying the warrantless seizure and search. See United States v. McGee, 736 F.3d 263, 269 (4th Cir. 2013). Each is discussed in turn.

### A. Investigatory Stop

In some instances, law enforcement officers must be empowered to protect themselves and other possible victims of violence, even where they lack probable cause for an arrest. See Terry v. Ohio, 392 U.S. 1, 24 (1968). Thus, officers may lawfully conduct a brief investigatory stop, so long as the stop is "supported at least by a reasonable and articulable suspicion that the person seized is engaging in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980); see Terry, 392 U.S. at 30. While such a stop does not necessitate probable cause, see United States v. Massenburg, 654 F.3d 480, 485 (4th Cir. 2011), it does require a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Black, 707 F.3d 531, 539 (4th Cir. 2013) (citation omitted). In other words, officers cannot rely on an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27; see United States v. Slocumb, 804 F.3d 677, 682 (4th Cir. 2015). Nor can they rely on post hoc rationalizations to subsequently validate seizures. See United States v. Foster, 634 F.3d 243, 249 (4th Cir. 2011).

When assessing the legality of a stop, courts "assess the totality of the circumstances to

determine if 'an objectively reasonable police officer' would have had reasonable articulable suspicion that [a suspect] was committing a crime at the time [the officer] seized him." United States v. Kehoe, 893 F.3d 232, 238 (4th Cir. 2018), cert. denied, 139 S. Ct. 842 (2019). "Individual facts and observations cannot be evaluated in isolation from each other." United States v. Hernandez-Mendez, 626 F.3d 203, 208 (4th Cir. 2010). And even factors that are individually "susceptible to innocent explanation" can, when taken together, "form a particularized and objective basis" to suspect criminal activity. United States v. Arvizu, 534 U.S. 266, 278 (2002).

Here, Defendant first contends Officer Szynarowski "had no reasonable suspicion that [he] was engaged in criminal activity" because "[a]t most, the officer responded to a report of a verbal argument," which "is not a crime." (Doc. No. 17 at 8). Relatedly, he asserts that, while he may have "placed something beneath his seat, [this] does not rise to reasonable suspicion of criminal activity" because "[m]any routine things are placed behind or under car seats, such as an umbrella[.]" (Id. at 9–10). He also maintains that his and McVay's inconsistent explanations for arguing do not create "particularized suspicion." (Doc. No. 22 at 5). Of course, Defendant is correct that these forms of conduct, standing alone, do not create particularized suspicion. But again, the reasonable suspicion inquiry "precludes this sort of divide-and-conquer analysis." Arvizu, 534 U.S. at 274. Instead, the objectively reasonable police officer looks to the totality of the circumstances, including "their own experience and specialized training" and inferences drawn therefrom, to decide whether there is a particularized basis for suspecting wrongdoing. Id. at 273.

By the time Defendant was told that he could not leave, a host of factors, when combined, create reasonable suspicion that domestic violence was afoot: (1) a Target employee informed the officer of a "loud disturbance [and] possible fight" in the parking lot; (2) the officer heard a "very, very loud scream" from a female "that sounded like she was in trouble"; (3) the officer discovered

6

a "male and a female" in the car with a crying child; (4) McVay admitted, but later denied, that she and Defendant were arguing; (5) the contrary explanations for the screaming were not commensurate with the scream that was heard; and (6) the officer's experience with "numerous" incidents suggested that domestic violence might be afoot. As the officer noted, victims of domestic violence may be initially unwilling to report abuse because of "danger" and "coercion" from the abuser. At a minimum, these facts support a brief separation of Defendant and McVay to ensure that the "possible fight" and "loud scream" was not a domestic violence incident.

Defendant asserts that Storey v. Taylor, an exigent circumstances case, undermines the officer's suspicions of domestic violence. See 696 F.3d 987, 994–96 (10th Cir. 2012). In fact, Storey bolsters his concerns. In Storey, officers responded to a report of a "domestic argument— specifically, a loud argument, at [the defendant]'s residence." Id. at 994. The officers ordered the defendant out of the house, but he refused, so officers arrested him. See id. at 993. The defendant then brought a civil rights claim for unlawful arrest. Highlighting the sanctity of the home, the Tenth Circuit first held that the exit order and arrest was not merely an investigatory detention. See id. at 993–94. Next, the Court considered whether exigent circumstances warranted the exit order. Id. at 993–94. Ultimately, the Court concluded they did not. Three of its reasons are noteworthy. First, the Court recognized that, "by the time police arrived, they could not hear or otherwise detect an ongoing altercation." Id. at 995. Second, the defendant "admitted he had an argument with his wife, but claimed the argument was now over and she had left." Id. Finally, no evidence "suggested a risk to [the wife's] safety." Id.

Here, these critical factors from Storey reveal that Officer Szynarowski's stop was reasonable. To begin, the officer's request to "hop out" did not occur in the confines of the home, but in a Target parking lot. Second, the officer was not simply responding to a report of a "loud

7

argument," but also of a "possible fight." In fact, he actually heard the "ongoing shouting as he approached the [vehicle]," including a distressed scream. Id. (citing Schreiber v. Moe, 596 F.3d 323, 330 (6th Cir. 2010); Tierney v. Davidson, 133 F.3d 189, 192 (2d Cir. 1998)). Next, rather than admitting there was an argument, Defendant and McVay provided inconsistent explanations for the screaming that were incommensurate with the scream the officer overheard. Finally, the officer here had continuing concerns that McVay was a victim of domestic violence—concerns which were not yet abated. Thus, Storey reinforces the officer's domestic violence suspicions.

Even if the officer lacked reasonable suspicion to investigate possible domestic crimes, several other factors demonstrate that the officer reasonably suspected that a "weapons crime" might have been occurring. When the officer asked Defendant to "hop out of the car" and to leave the child,[2] he: (1) hesitated for several seconds; (2) turned his body toward the officer to obstruct his view; (3) appeared to hold a plastic bag; (4) appeared to tuck something underneath the passenger seat; and (5) exited the vehicle with the child in his arms. When considered alongside previously discussed factors, these furtive, obstructive actions support a brief investigatory stop to confirm or dispel the officer's suspicion that Defendant possessed a weapon and that he possessed it unlawfully. See United States v. Gardner, 823 F.3d 793, 800 (4th Cir. 2016), overruled on other grounds, Stokeling v. United States, 139 S. Ct. 544 (2019); United States v. Thorpe, 36 F.3d 1095 (4th Cir. 1994) (table) (recognizing a "passenger's peculiarly furtive actions" can be "consistent with that of a person trying to reach for a weapon or hide [contraband]").

---

[2] Neither Defendant nor the Government suggest that Defendant was seized at the point he was asked to "hop out of the car." (See Doc. No. 17 at 5–6 (arguing Defendant and McVay were seized when they were told "they were not free to leave when they asked to do so"); Doc. No. 20 at 4–5 (listing post-exit details to support a subsequent seizure)). Regardless, the Court finds that a reasonable person would not feel unable to terminate a police encounter merely because a single officer, without force, asked the individual to "hop out of the car." See Jones, 678 F.3d at 299.

B.  **Vehicle Protective Search**

Even though Officer Szynarowski was justified in conducting a brief investigatory stop, this does not necessarily guarantee that his vehicle protective search was lawful. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998). Rather, to proceed to a search, the "officer must reasonably suspect that the [suspect] is armed and dangerous" to the safety of the officer or others. Arizona v. Johnson, 555 U.S. 323, 327 (2009); see Terry, 392 U.S. at 30. A protective search can extend to the "passenger compartment of an automobile" as long as it is "limited to those areas in which a weapon may be placed or hidden" and to where the potentially dangerous "suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983).

Defendant briefly suggests the officer did not have reasonable suspicion that he was armed and dangerous, again by isolating individual facts and providing possible innocent explanations for them. And again, the Court rejects this divide-and-conquer argument. See Arvizu, 534 U.S. at 274. As discussed, when considered alongside other factors, Defendant's furtive and obstructive movements afforded a reasonable basis to believe that he was armed and dangerous. See supra Part II.A; see, e.g., United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) ("A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon.").

More forcefully, Defendant asserts the vehicle search was not justified because "purported safety concerns[3] were neutralized when the officer placed [Defendant] and . . . McVay in handcuffs." (Doc. No. 17 at 15). In other words, Defendant and McVay were not dangerous

---

[3] Defendant notes that an officer who "was actually concerned about safety . . . would have ensured the young toddler was safe while the officer handcuffed the child's parents." (Doc. No. 17 at 15). The Court shares Defendant's concern; at several points during the stop, it appears the child is left to wander the parking lot alone. Although officers must make "quick decisions" when conducting an investigatory stop, Long, 463 U.S. at 1053, protecting the public also requires protecting its most vulnerable members—including the child of a potentially dangerous criminal suspect.

9

because they could not gain immediate control of any weapon. But even though Defendant and McVay were handcuffed, the officer testified that he could have been overpowered "while [he] was] still outnumbered." Furthermore, although Defendant was detained during the protective search, he was solely detained for a brief investigatory stop. "If [he] had been released after the brief detention, as he presumably would have been, he would have regained access to his vehicle and any weapon inside." United States v. Griffin, 589 F.3d 148, 154 (4th Cir. 2009). As always, the touchstone of the Fourth Amendment is reasonableness. See Long, 463 U.S. at 1051. And in this case, Officer Szynarowski did not act unreasonably by ensuring Defendant and McVay would not "at some later point in the encounter, have the chance to retrieve a weapon from the vehicle." United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007).[4]

## III. CONCLUSION

For the foregoing reasons, Officer Szynarowski's investigatory stop and vehicle protective search were reasonable under the totality of the circumstances. Accordingly, Defendant's motion to suppress all evidence and statements obtained from the search is denied.

---

[4] For the same reasons, the Court rejects Defendant's assertion that the officer "illegally escalated the stop into a warrantless arrest." (Doc. No. 17 at 12). The officer curtailed Defendant's freedom only to the extent necessary to dispel reasonable suspicions of criminal activity and to ensure that he was neither armed nor dangerous.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress (Doc. No. 17) is **DENIED.**

Signed: February 11, 2020

Max O. Cogburn Jr
United States District Judge